UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:18-cr-10372-FDS |
| | ) | |
| DAVID AMADIN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE FROM INCARCERATION**

The United States of America, through counsel, submits this opposition to Defendant's Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A) ("Defendant's Motion"), Dkt. No. 63. Although sympathetic to concerns pertaining to the COVID-19 pandemic, the Government opposes Amadin's motion for immediate release.

*First*, Amadin is a relatively healthy 29-year-old male. Although Amadin complains that he suffers from "anxiety, depression, insomnia, and violent nightmares," Def.'s Mot. at 1, none of those conditions constitute an "extraordinary and compelling reason" sufficient to warrant modification of his sentence pursuant to § 3582(c)(1)(A)(i), contrary to Defendant's argument.

*Second*, the Bureau of Prisons ("BOP") has taken extensive measures in light of the COVID-19 pandemic to mitigate the spread of infection. The current COVID-19 infection statistics reported by FCI-Berlin suggest that the institution has been successful in containing and mitigating the spread of the virus.

*Third*, even if Amadin were able to satisfy the "extraordinary and compelling reason" threshold necessary to consider compassionate release, the balance of the remaining factors set forth in § 3553(a) weigh strongly against his release. Amadin stands convicted of Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). Furthermore,

PATTERN indicated that his risk of recidivism is high. Def.'s Exhibit 2 at 3. Therefore, Amadin's prior criminal conduct suggests that he would present an unacceptable risk of danger and non-compliance were Amadin to be released.

*Finally*, Amadin has served less than half of 63-month sentence that he received pursuant to his plea agreement with the government. Amadin is currently scheduled to be released in late 2023, which includes credit for good time. Given the seriousness of Amadin's prior criminal history, his release would present an untenable risk of danger to the community and would not be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). It would also send precisely the wrong message to the community concerning the seriousness of Amadin's prior illegal conduct and gang affiliation.

For all of these reasons, this Court should deny Amadin's motion for release.

## I. BACKGROUND

On July 8, 2018, two plain-clothes officers with the Boston Police Department's Youth Violence Strike Force, Jeff Connolly and Connor Hardy, were patrolling the Mattapan neighborhood in Boston, Massachusetts. Presentence Investigation Report ("PSR") ¶ 8. While driving in their unmarked car, they heard three gunshots coming from the Roberts Playground area. PSR ¶ 9. The officers turned their car around and proceeded toward the Playground. PSR ¶¶ 9-10. Upon arriving at 46 Torrey Street, they noticed an African American male appear from nearby bushes and begin walking in the officer's direction. PSR ¶ 10. The officers then recognized the male as David Amadin, whom they knew to be an affiliated with the Annuciation Road Gang and whom they knew had a long arrest log that included firearms offenses. PSR ¶ 10. Noticing what appeared to be a firearm in Amadin's waistband, the officers exited their vehicle and called out to Amadin in hopes of speaking with him. PSR ¶¶ 10-12.

Upon calling out to him, Amadin immediately began to run away from the officers. PSR ¶ 12. The officers chased after him. PSR ¶ 12. While doing so, they noticed him holding something against his waistband with his right hand and only pumping with his left arm. PSR ¶¶ 12-13. This behavior was consistent for most of the chase, until Officer Hardy noticed Amadin make a throwing motion with his right hand as they ran through the backyard of 46 Torrey Street. PSR ¶ 14. At this moment, Officer Hardy noticed "a black object" moving through the air toward the direction of a one-story-garage roof and, shortly thereafter, "heard the object make a distinct thud upon landing." PSR ¶ 14. Immediately after Amadin threw the object, he surrendered, and was secured. PSR ¶¶ 14-15.

Upon returning to the scene, Officer Hardy and Sergeant Patrick Browning located the firearm. PSR ¶ 15. It was on the roof of a garage, which had dirt and moss on its surface. PSR ¶ 15. When they retrieved the firearm, they noticed that the weapon "had moss in its muzzle." PSR ¶ 15. Officer Hardy later inquired as to whether Amadin had a license to carry. PSR ¶ 16. When he did so, "Amadin laughed." PSR ¶ 16.

Officers also located an automobile registered to Amadin's grandfather that was parked nearby. PSR ¶ 17. The Acura TL was running, and, in plain view, had "substantial amounts of cash spread around the front seat." PSR ¶ 17. Amadin later confirmed that the funds were his. PSR ¶ 17.

On April 23, 2019, David Amadin plead guilty to Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 1). PSR ¶ 2. Pursuant to the plea agreement, the parties agreed on a sentence of 63 months' imprisonment, with three years of supervised release, and a fine within the applicable guideline range, which the Court imposed. To

date, Amadin has served less than half of the total sentence. With credit for good time, he will be released in late 2023.

## II. APPLICABLE LEGAL FRAMEWORK

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States,* 560 U.S. 817, 824-25 (2010). "[T]here is no 'inherent authority' for a district court to modify a sentence as it pleases; indeed a district court's discretion to modify a sentence is an exception to [§ 3582's] general rule" barring modification. *United States v. Cunningham,* 554 F.3d 703, 708 (7th Cir. 2009); *cf. United States v. Goodwyn,* 596 F.3d 233, 235 (4th Cir. 2010) (noting that 18 U.S.C. § 3582(b) "states that a district court may not modify a term of imprisonment once it has been imposed unless the Bureau of Prisons moves for a reduction, the Sentencing Commission amends the applicable Guidelines range, or another statute or Rule 35 expressly permits the court to do so").

Section 3582(c)(1)(A) represents an exception to this general rule. The statute, adopted as part of the Sentencing Reform Act of 1984, originally permitted judicial relief only upon a motion by the BOP Director. The provision was amended by Section 603(b) of the First Step Act, effective December 21, 2018. Under the statute as amended, a court may now consider a defendant's motion for compassionate release following the exhaustion of his or her administrative remedies with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). The First Step Act did not amend the eligibility requirements for compassionate release, which are set forth in 18 U.S.C. § 3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines.

### A. The Extraordinary and Compelling Reason Requirement

4

The defendant bears the burden of proving that he is entitled to relief under 18 U.S.C. § 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

Once satisfying the threshold precondition of waiting 30 days following the receipt of the defendant's request to the warden,[1] the court may modify a sentence only if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i).[2] The proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 Application Note 1. The first of addresses defendants suffering from terminal illnesses and advanced illnesses that reduce life expectancy such as advanced dementia. *Id.* at App. Note 1(A)(i). Also within Note 1(A) are defendants suffering from other serious illnesses, such as a serious functional or cognitive impairment, or deteriorating mental health because of the aging process.[3] *Id.* at App. Note 1(A)(ii). Each medical condition in this Section "substantially diminishes the ability of the defendant to

---

[1] Amadin has satisfied this requirement.

[2] Section 3582(c)(1)(A)(ii) provides other bases by which a defendant may be eligible for compassionate release; however, none of these factors are applicable in this case.

[3] "Age of the Defendant" is also an extraordinary and compelling reason. However, because Amadin is under 65, this factor is not applicable. *See* App. Note 1(A)(ii).

provide self-care within the environment of a correctional facility *and* from which he or she is not expected to recover." *Id.* at App. Note 1 (emphasis added).

Also of relevance is Application Note 1(C), which addresses family circumstances. These circumstances qualify as extraordinary and compelling reasons in only two specific instances: "The death or incapacitation of . . . the defendant's minor child or children" or "[t]he incapacitation of the defendant's spouse when defendant would be the only available caregiver for the spouse or registered partner." *Id.* at App. Note 1(C).

Additionally, Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* at App. Note 1(D). Accordingly, a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release.

That regulation appears at BOP Program Statement 5050.50. This program statement took effect on January 17, 2019, following passage of the First Step Act, and contains standards that are both more extensive than and slightly different from those stated in the § 1B1.13 Policy Statement. As is relevant here, the Program Statement defines a "debilitated medical condition" as follows:

> Debilitated Medical Condition. RIS[4] consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover. The BOP should consider a RIS if the inmate is:
>
> - Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or

---

[4] RIS refers to a "reduction in sentence." Program Statement 5050.50 at 4.

6

- Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.

The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function). A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Program Statement 5050.50 at 5.[5]

Even when an extraordinary and compelling reason exists, however, a court should only grant a motion for release if it determines that the defendant is not a danger to the public. USSG § 1B1.13(2). And, the court must consider, in general, whether the § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.

B.     **BOP's Response to the COVID-19 Pandemic**

The COVID-19 pandemic has presented an unprecedented risk to the worldwide community, including to individuals and staff at jails and prisons. It is a highly contagious virus about which little was known when it first emerged in the United States. Thereafter, public health officials at the local, state, and national levels have continuously sought to provide guidance as to the best measures to prevent and/or limit the spread of the virus.

The BOP has begun administering vaccines to inmates under guidance from the CDC. The vaccine has been delivered to staff and inmates at more than half of the BOP's correctional

---

[5] As noted, the Program Statement's provisions regarding the class of inmates eligible for compassionate release is slightly different from the related provision in Section 1B1.13. To the extent that the Program Statement and the Policy Statement conflict, it is the Policy Statement in Section 1B1.13–*i.e.*, the source directly authorized by statute–that is binding. An interpretation in the Program Statement that does not contradict the Policy Statement, however, is entitled to some weight. *See Reno v. Koray*, 515 U.S. 50, 61 (1995) (BOP program statements, which do not require notice and comment, are entitled to "some deference" where they reflect a "permissible construction of the statute") (internal quotation marks omitted).

facilities and all of the BOP's facilities are expected to receive their first dose by mid-February. According to data from the CDC, as of January 15, 2021, the BOP leads all jurisdictions and Federal entities in its rate of vaccination utilization, having administered 97% of all vaccine doses received. As of January 15, 2021, the BOP administered 17,189 doses of the vaccine, with one dose administered to 7,576 staff and 5,457 inmates and a completed series of two doses to 1,027 staff and 1,051 inmates. *See* https://www.bop.gobopv/resources/news/20210116_covid_vaccine_efforts_commended.jsp (last visited February 8, 2021).

Outside the vaccine, the BOP, after consultation with public health officials, including at the Centers for Disease Control ("CDC"), has aggressively implemented a series of policies and procedures designed to prevent and/or mitigate the spread of COVID-19 within its facilities. With time and as health experts learn more about the virus, the BOP has continued to refine and implement additional comprehensive procedures relating to screening, testing, treatment, prevention, education and infection control.

The policies and procedures implemented by the BOP have come in various stages, referred to as "Phase I" through "Phase IX." Since March 2020, the BOP began taking extensive measures to modify their operations in an effort to increase social distancing among staff and inmates and to reduce the risk and spread of COVID-19. More specifically, these measures include suspension/modification of social visits and tours, restriction of inmate movement inside and outside of the facilities, health screens and testing of staff and inmates.

In a further step to limit the spread of COVID-19 within the BOP's facilities and decrease its prison population while protecting the general public, the BOP has engaged in an additional step of identifying and designating appropriate inmates for transfer from each of the BOP's

facilities nationwide to extended home confinement. This initiative was based upon the Attorney General's expanded authority pursuant to § 12003(b)(2) of the CARES Act, which lengthened the amount of time that the Attorney General may place an inmate in home confinement pursuant to 18 U.S.C. § 3624(c)(2). Pursuant to this initiative, staff at each institution are reviewing each inmate's medical history to determine whether he or she is at increased risk based upon age and vulnerability. The inmate is then assessed upon various other criteria (including, but not limited to, violence or gang-related activity in prison or disciplinary misconduct at BOP within the past year; risk of recidivism; presentation of a demonstrated and verifiable reentry plan that will prevent recidivism and maximum public safety; verification that the release plan would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility; and the inmate's offense of conviction and the assessment of danger posed by the inmate to the community).[6] Should the staff recommend home confinement is appropriate, that recommendation then goes to the Residential Re-entry Management Office at the BOP Regional Office for final approval.

Although inmates at institutions having a high incidence of COVID-19 infections were given first priority, the Attorney General mandated that the review should include all at-risk

---

[6] *See* Attorney General's Memorandum for Director of Bureau of Prisons, *Prioritization of Home Confinement As Appropriate in Response to the COVID-19 Pandemic* (March 26, 2020), available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last accessed on February 8, 2021).

inmates.[7]  As of January 19, 2021, BOP has placed 20,480 inmates on home confinement (including those who have completed their sentences) pursuant to this authority.[8]

## III.  ARGUMENT

Amadin has not established that he is at severe risk of serious illness were he to contract the COVID-19 virus or that the COVID-19 pandemic thus presents an extraordinary and compelling reason warranting his release at this time.  Instead, Amadin speculates that his mental health condition puts him at serious risk of infection.  Even if that were true, however, Amadin's mental health does not present a significant risk of complications.  Furthermore, even if Amadin's medical conditions placed him at severe risk of serious illness were he to contract the COVID-19 virus, the § 3553(a) factors—particularly the magnitude of Amadin's prior offense—would nonetheless support his continued incarceration.

### A.  Amadin's Medical Conditions Does Not Place Him at Increased Risk of Severe Illness from COVID-19.

While COVID-19 is a new disease and much continues to be learned about the disease on a daily basis, medical evidence from the CDC indicates that Amadin is not currently at greater risk than most inmates in the federal system.  As more data relating to COVID-19 is collected and analyzed, the CDC is regularly reviewing and revising the risk profile for individuals with certain underlying medical conditions.  Based upon this review, the CDC has identified certain

---

[7] Attorney General's Memorandum for Director of Bureau of Prisons, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (April 3, 2020), available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf (last accessed on November 10, 2020).

[8] *See* BOP, *Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19 pandemic,* available at https://www.bop.gov/coronavirus/faq.jsp (last visited on January 19, 2021).

individuals, based upon their increased age and/or preexisting medical conditions, who are at an increased risk of severe illness from COVID-19.

The CDC currently has identified the following preexisting medical conditions of placing individuals at any age "**at increased risk** of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); down syndrome; heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m$^2$ or higher but < 40 kg/m$^2$); severe obesity (BMI ≥ 40 kg/m$^2$); pregnancy; sickle cell disease; smoking; and Type 2 diabetes mellitus." *See* CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed February 8, 2021) (emphasis in original) (hereinafter "CDC COVID-19 Guidance"). Amadin does not suggest that he meets any of these "high risk" CDC categories.

Amadin's medical records do not demonstrate that he is currently suffering from a condition that would necessitate his immediate release from custody. Instead, Amadin argues that "anxiety, depression, insomnia, and panic attacks weaken his immune system and make him vulnerable should he contract COVID-19." Def's. Mot. at 16. However, there is no indication within the CDC COVID-19 Guidance of this being true. The most analogous criterion for a potential increase of risk is "Neurological conditions such as dementia." *See* CDC COVID-19 Guidance. This criterion is not applicable for two reasons. First, this criterion falls into the latter category of individuals who "**might be at an increased** risk for severe illness from the virus that causes COVID-19." *Id.* (emphasis in original). Compassionate release has almost entirely been granted for defendants who, instead, "are" at an increased risk. *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (granting compassionate release to an obese defendant with Type 2 diabetes mellitus). Secondly,

neurological conditions are considered neurological disorders, and "include epilepsy, Alzheimer disease and other dementias, cerebrovascular diseases including stroke, migraine and other headache disorders, multiple sclerosis, Parkinson's disease, neuroinfections, brain tumours [sic], traumatic disorders of the nervous system due to head trauma, and neurological disorders as a result of malnutrition." World Health Organization, *Mental health: neurological disorders*, https://www.who.int/news-room/q-a-detail/mental-health-neurological-disorders#, (last accessed February 6, 2021). These conditions align with BOP Program Statement 5050.50, which describes cognitive deficits similarly.

Defendant's more compelling argument is that he has a family history of hypertension. Indeed, Defendant did have high blood pressure in 2018, and his blood pressure at that time may have indicated "Stage 2 Hypertension." Def's. Mot. at 8. However, Defendant has not provided any indication of what his blood pressure is at this time. The blood pressure readings provided by Defendant are nearly three years old. *See id.* He may have lower numbers now than he did then. Moreover, even if it is true that he has a family history of hypertension, that alone does not place him at an increased risk of COVID-19 complications. Instead, several steps along a causal chain must be satisfied in order for Amadin to be considered at risk by the CDC COVID-19 guidelines. First, there must be readings indicating that Amadin is presently indicating hypertension. Next, there must be a diagnosis of hypertension. Satisfying each of these conditions puts Amadin in the latter category of individuals who "**might be at an increased** risk for severe illness from the virus that causes COVID-19." *Id.* (emphasis in original). Even at this point, however, Amadin is not necessarily at an increased risk of COVID complications. This risk must be elevated to being "**at increased risk** of severe illness from COVID-19." *Id.* (emphasis in original).

Defendant's analysis therefore fundamentally misinterprets Section 1B1.13. Amadin argues that his "mental health issues, compounded by the COVID-19 pandemic, have substantially

diminished [his] ability to provide self-care in BOP custody." Def.'s Mot. at 10-14. As a result, he argues, there is an extraordinary and compelling reason for his compassionate release. *See id.* at 2. However, this analysis ignores Note 1(A) from which it is derived. The medical condition must then "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility . . . ." U.S.S.G. § 1B1.13 Application Note 1. In addition, the condition must be one in which defendant "is not expected to recover." *Id.* Therefore, both Amadin's mental health issues and his 2018 blood pressure readings alleging hypertension fail to satisfy 1B1.13 for two reasons. First, neither would qualify under Note 1(A)(ii) as a serious medical condition, serious functional or cognitive impairment, or deteriorating mental health as a result of aging.[9] *See id.* at App. Note 1(A)(ii). Secondly, there is no reason to believe that Defendant will not recover from his mental health issues or high blood pressure. To the contrary, given his relatively young age, there is reason to believe that he should be able to recover.

Amadin's arguments with regards to family history are also irrelevant. Having a family history of a medical condition does not qualify as a medical offense within the definition of U.S.S.G. § 1B1.13 Application Note 1. Those requirements are clearly defined and specific. Both Note 1(C)(i) and (ii) involve the death or incapacitation of an immediate family member. Neither is applicable to Amadin. As a result, Amadin's arguments regarding his family history of medical conditions not only fails to fall within Note 1(A), it also fails to fall within Note 1(C).

Amadin does not support his argument that he is at a greater risk of infection with anything more than generalized statistics regarding infections in BOP facilities. For example, Defendant argues that "there are over 3,000 active COVID-19 cases among BOP inmates across the nation and nearly 2,000 cases among BOP staff." Defendant's Motion at 9-10. This does not demonstrate

---

[9] Because Amadin's alleged illness is not terminal, App. Note 1(A)(i) is not applicable.

that Amadin is at a greater risk of COVID-19 than other inmates. In fact, Amadin's argument cuts against him. Amadin does not point to any active cases of COVID-19 amongst BOP inmates at FCI-Berlin. Instead, he relies upon a minute number of active COVID-19 case amongst FCI-Berlin staff. *Id.* at 10. Given that, as Amadin points out, there are "nearly 2,000 [active] cases among BOP staff," *Id.* at 10, and only a very small number[10] of these active cases are at FCI-Berlin, Amadin appears to have a remarkably small risk of infection compared to inmates at other BOP facilities.

Therefore, not only has Amadin not demonstrated that he is at a risk of COVID complications, he has actually demonstrated that his risk of infection may actually be lower than that of inmates at other facilities. This latter factor alone significantly reduces Amadin's risk of severe illness from COVID-19. As a result, Amadin is not an inmate for whom compassionate release is warranted.

> **B. FCI-Berlin Has Taken Steps to Significantly Reduce the Risk of COVID-19 Infection among Inmates and Staff**

The measures that the BOP has adopted to combat the COVID-19 virus have proven successful to varying degrees at its facilities throughout the country. To date, FCI-Berlin, the institution where Amadin is incarcerated, has successfully contained and mitigated against an outbreak by implementing additional procedures and safeguards. The numbers bear this out: as of February 8, 2021, there are only ***three staff members*** having confirmed COVID-19 infections and ***zero inmates*** with a confirmed COVID-19 diagnosis. *See* BOP, Covid-19 Cases, available at https://www.bop.gov/coronavirus/ (last accessed February 8, 2021). BOP also reports that there

---

[10] Defendant points to one active case at the time filing. However, as will be discussed in the next Section, BOP statistics have pointed out that there may instead be a total of three active cases amongst staff at the time of filing. *See* BOP, Covid-19 Cases, available at https://www.bop.gov/coronavirus/ (last accessed February 8, 2021).

have are nine inmates at FCI-Berlin who have recovered from positive tests, and there have been no deaths. *Id.* This is a reflection of FCI-Berlin's successful implementation of policies and procedures designed to control and mitigate the spread of the virus. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. *See, e.g., United States v. Edwards,* 2020 WL 5518322, *3 (D.D.C. Sept. 12, 2020) (rejecting defendant's argument for compassionate release and noting that the conditions at FCI Berlin "pose comparatively little risk in terms of COVID-19 exposure"); *accord United States v. Pomales,* 2020 WL 4677596, *3 (S.D.N.Y. Aug. 12, 2020) (noting that the "relative lack of positive COVID-19 cases in and around FCI Berlin, together with the steps that the BOP is taking to counter the spread of COVID-19 in its facilities as a whole also weigh against a finding of extraordinary and compelling circumstances").[11]

### C. The § 3553(a) Sentencing Factors Overwhelmingly Support Amadin's Continued Incarceration

Even if Amadin's medical conditions provided an extraordinary and compelling reason warranting consideration for compassionate release pursuant to § 1B1.13(1)(A), which the government contests, he must still demonstrate that his proposed release is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). This, in turn, requires consideration of the factors expressed in 18 U.S.C. § 3553(a)—including, *inter alia*, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to provide the defendant with needed . . . medical

---

[11] Coos County, New Hampshire, where FCI-Berlin is located, has only had a cumulative total of 1,194 COVID-19 infections and 31 deaths since the pandemic began. *See* New Hampshire Department of Health and Human Services, COVID-19 Interactive Map Dashboard, https://www.nh.gov/covid19/dashboard/map.htm#dash (last accessed on February 8, 2021).

care or other correctional treatment; the applicable guidelines; and pertinent Sentencing Commission policy statements. *See* USSG § 1B1.13.

Upon consideration of these factors, the scale tips overwhelmingly in favor of Amadin's continued incarceration. Amadin was convicted of being a felon in possession of a firearm. PSR ¶ 2. The firearm alone makes this a very serious offense. *United States v. Leviner*, 31 F. Supp. 2d 23, 25 (D. Mass. 1998) (calling the offense "unquestionably a serious one," especially upon hearing gunshots immediately prior). The offense may be considered even more serious when a Defendant is affiliated with a gang. *See, e.g.*, *United States v. Monell*, 801 F.3d 34, 50 (1st Cir. 2015) (holding "gang membership and affiliation" to be aggravating factors). There is also evidence that Amadin knew he should not have been in possession of a firearm. Throughout his attempt to flee the officers, Amadin held a weapon closely to him. PSR ¶¶ 12-13. Right before the case ended, Amadin threw his weapon onto the roof of a nearby garage. PSR ¶ 14. After completing the throw, he gave himself up to authorities, PSR ¶¶ 14-15, likely figuring that authorities no longer had evidence of any wrongdoing. Indeed, Amadin could have kept running after removing the firearm from his person, but he elected not to do so. PSR ¶¶ 14-15.

Amadin has not completed half of his sentence for this very serious offense. Amadin argues, despite this fact, he should be put on supervised released for the remainder of his sentence. Def.'s Mot. at 18-19. As is stated at the outset of Section 1b1.13, the Court "may impose a term of supervised release with or without conditions that *does not exceed the unserved portion of the original term of imprisonment*." USSG § 1B1.13 (emphasis added). If the Court were to compassionately release Amadin at this time, it would necessarily be imposing a term of supervised release that is longer than his remaining term of imprisonment.

Furthermore, Amadin has a significant criminal record as well, with charges for carrying a loaded firearm without license, possessing ammunition without FID card, and firearms violations with two prior violent/drug crimes. PSR ¶¶ 58. Amadin has also been charged with violent offenses, such as domestic assault & battery and threat to commit bodily harm. PSR ¶¶ 55. Furthermore, Amadin has repeatedly violated his probation. PSR ¶¶ 47, 55, 56. Amadin's criminal history, particularly his history of prior violent offenses, his gang affiliation, as well as the seriousness of the instant offense, demonstrate a risk to the community should Amadin be released. *Cf. United States v. Omay Ford,* No. 11-Cr-10062-NMG, ECF. Dkt. 1348 (D. Mass. Aug. 14, 2020) (although defendant suffered from condition that might cause increased risk of severe illness from COVID-19 and was incarcerated at institution that was previous "hot spot," compassionate release not warranted given that prison's policies and procedures had "dramatically reduced the rate of COVID-19 infections," that the defendant was "a career criminal who has spent much of the past 20 years in prison," and that the defendant was "currently serving a 15-year sentence for an egregious criminal offense").

## V. CONCLUSION

The COVID-19 pandemic is an unprecedented public health emergency that has caused great concern throughout the world. It does not, however, require the release of all federal inmates. Amadin is a dangerous criminal whose medical conditions do not require his release. His motion for compassionate release should be denied.

          Respectfully submitted,

          ANDREW E. LELLING
          United States Attorney

By:   */s/ Timothy E. Moran*
       TIMOTHY E. MORAN
       Assistant United States Attorney

CERTIFICATE OF SERVICE

      I hereby certify that the foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

>  */s/ Timothy E. Moran*
> TIMOTHY E. MORAN
> Assistant United States Attorney

February 13, 2021